# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **SHERRY L. RING,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:15cv00017 |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | BY: Pamela Meade Sargent |
| | ) | United States Magistrate Judge |

## I.  Background and Standard of Review

Plaintiff, Sherry L. Ring, ("Ring"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

-1-

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Ring protectively filed an application for DIB on October 26, 2011, alleging disability as of August 12, 2011, due to high blood pressure; fibromyalgia; sleep apnea; meningioma;[1] acid reflux; bilateral carpal tunnel syndrome; fatigue; joint pain; headaches; depression; and anxiety. (Record, ("R."), at 170-71, 183, 187, 218, 227.) The claim was denied initially and on reconsideration. (R. at 75-77, 82, 85-87, 89-91.) Ring then requested a hearing before an administrative law judge, ("ALJ"). (R. at 92.) A video hearing was held on January 13, 2014, at which Ring was represented by counsel. (R. at 27-47.)

By decision dated February 7, 2014, the ALJ denied Ring's claim. (R. at 9-22.) The ALJ found that Ring met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2015. (R. at 11.) The ALJ also found that Ring had not engaged in substantial gainful activity since August 12, 2011, her alleged onset date.[2] (R. at 11.) The ALJ found that the medical evidence

---

[1] Meningioma is defined as a slow-growing tumor of the meninges often creating pressure and damaging the brain and adjacent tissues. *See* STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"), 503 (1995).

[2] Therefore, Ring must show that she became disabled between August 12, 2011, the alleged onset date, and February 7, 2014, the date of the ALJ's decision, in order to be entitled to

-2-

established that Ring suffered from severe impairments, namely benign brain tumor; arthralgias, including foot pain and degenerative disc disease; carpal tunnel syndrome; obesity; depression; and anxiety, but he found that Ring did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 11.) The ALJ found that Ring had the residual functional capacity to perform simple, routine, repetitive, unskilled light work[3] that did not require more than occasional kneeling, crawling, crouching, stooping, balancing or climbing ramps and stairs; and that did not expose her to hazards or climbing ladders, ropes or scaffolds. (R. at 13-14.) The ALJ found that Ring was able to perform her past relevant work as a cashier and a cleaner. (R. at 20.) In addition, based on Ring's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Ring could perform, including jobs as a picker and a deli slicer. (R. at 21.) Thus, the ALJ found that Ring was not under a disability as defined by the Act, and was not eligible for DIB benefits. (R. at 22.) *See* 20 C.F.R. § 404.1520(f), (g) (2015).

After the ALJ issued his decision, Ring pursued her administrative appeals, (R. at 239-41), but the Appeals Council denied her request for review. (R. at 1-4.) Ring then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981

---

DIB benefits.

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2015).

(2015). The case is before this court on Ring's motion for summary judgment filed April 25, 2016, and the Commissioner's motion for summary judgment filed May 26, 2016.

## II. Facts

Ring was born in 1962, (R. at 170), which, at the time of the ALJ's decision, classified her as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). Ring has a tenth-grade education[4] and past work experience as a cashier and a cleaner. (R. at 32-33, 208, 233.) Ring testified that she did not take any prescribed pain medication. (R. at 31.) She stated that she did not get treatment for her foot pain, but was told to take ibuprofen. (R. at 31.) Ring stated that she cleaned only her son's house rather than many houses as indicated in one of her medical reports. (R. at 33-34.) She stated that she cleaned for her son a couple of hours twice a week. (R. at 39.) Ring stated that she spent most of her day watching television. (R. at 41.)

Vocational expert, Gerald K. Wells, also testified at Ring's hearing. (R. at 43-46.) Wells classified Ring's work as a cashier and as a maid/cleaner as light and unskilled. (R. at 44-45.) Wells was asked to consider a hypothetical individual of Ring's age, education and work history who had the residual functional capacity to perform light work that did not require more than occasional climbing, balancing, stooping, kneeling, crouching and crawling; that did not require her to work around

---

[4] Ring reported on her Disability Report that she completed the ninth grade; she testified at her hearing that she completed the eighth grade; yet school records indicate that she completed the tenth grade. (R. at 32, 188, 233.)

-4-

hazards, such as hazardous machinery, unprotected heights and climbing of ladders, ropes or scaffolds; and that, due to some concentration limits, education limits and past work history, she would be limited to unskilled work. (R. at 44.) Wells stated that such an individual could perform Ring's past work, as well as other jobs that existed in significant numbers, including jobs as a picker and a deli slicer. (R. at 44-45.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Dr. Andrew Bockner, M.D., a state agency physician; Dr. Thomas M. Phillips, M.D., a state agency physician; Jeanne Buyck, Ph.D., a state agency psychologist; Dr. Joseph Duckwall, M.D., a state agency physician; Norton Community Hospital; Appalachia Family Health Center; Dr. Tarandeep Kaur, M.D.; Crystal Burke, L.C.S.W., a licensed clinical social worker; Frontier Health; University of Virginia Health System; Robert S. Spangler, Ed.D., a licensed psychologist; Dr. Jody Bentley, D.O.; and Dr. Kevin Blackwell, D.O.

On October 4, 2010, Dr. Tarandeep Kaur, M.D., a physician at Appalachia Family Health Center, saw Ring for complaints that her blood pressure and blood sugar levels had been high. (R. at 291-93.) Ring was oriented, and her memory, mood, affect, judgment and insight were reported as normal. (R. at 292.) Dr. Kaur diagnosed hyperglycemia, rhonchi and hypertension. (R. at 293.) On November 15, 2010, Ring complained of chest pressure. (R. at 288-90.) Ring was oriented, and her memory, mood, affect, judgment and insight were reported as normal. (R. at 289.) An EKG was normal. (R. at 290.) Ring was diagnosed with hypertension, dyslipidemia, chest pressure and perimenopausal syndrome. (R. at 290.)

-5-

On May 5, 2011, Crystal Burke, L.C.S.W., a licensed clinical social worker at Appalachia Family Health Center, saw Ring for complaints of stress and feeling overwhelmed. (R. at 284.) Ring reported that her spouse was disabled and very dependent on her and that her three adult children also were dependent on her. (R. at 284.) Burke reported that Ring was alert and oriented, her memory was intact, and her mood was depressed. (R. at 284.) Burke diagnosed depression, and noted that Ring had some dependencies in her personality. (R. at 284.) That same day, Dr. Kaur diagnosed Ring with hypertension, dyslipidemia, depression and gastroesophageal reflux disease, ("GERD"). (R. at 287.) He noted that Ring was oriented, and her memory, mood, affect, judgment and insight were normal. (R. at 334.)

On October 4, 2011, Ring complained of generalized pain, headaches and numbness in her hands. (R. at 280-82.) Dr. Kaur reported that Ring was oriented, and her memory, mood, affect, judgment and insight were normal. (R. at 281.) She was diagnosed with dizziness, hypertension, cystocele[5] and dysphagia.[6] (R. at 282.) On October 17, 2011, an MRI of Ring's brain showed a mass lesion in the left parasellar region, which likely represented a meningioma. (R. at 294, 306.) On November 11, 2011, Ring complained of depression. (R. at 275-77.) She reported that her husband left her in October. (R. at 275.) Ring stated that she attempted to take Cymbalta, but that it made her dizzy and kept her from sleeping. (R. at 275.) Ring's memory, mood, affect, judgment and insight were normal. (R. at 276.) She

---

[5] Cystocele is defined as herniation of the bladder. *See* Stedman's at 205.

[6] Dysphagia is defined as difficulty in swallowing or inability to swallow. *See* Stedman's at 248.

-6-

was diagnosed with insomnia, depression, dyslipidemia and meningioma. (R. at 277.) On December 13, 2011, Ring complained of dizziness and headaches. (R. at 324.) Ring was oriented, and her memory, mood, affect, judgment and insight were normal. (R. at 325.)

On February 22, 2012, Ring reported that her dizziness had improved, but she continued to complain of headaches. (R. at 321.) Ring was oriented, and her memory, mood, affect, judgment and insight were normal. (R. at 322.) Ring stated that she was not taking her medication; thus, Dr. Kaur recommended counseling for her depression. (R. at 321, 323.) On February 24, 2012, x-rays of Ring's thoracic spine showed mild S-shaped scoliosis and very nominal osteophytes at the mid-levels. (R. at 342.) That same day, x-rays of Ring's left knee showed minimal medial compartment narrowing. (R. at 342.) On July 10, 2012, Ring complained of pain in her feet, back and legs. (R. at 318.) Ring was oriented, and her memory, mood, affect, judgment and insight were normal. (R. at 319.) She was diagnosed with fatigue, multiple pains and hypertension. (R. at 320.) On November 7, 2012, Ring reported bilateral foot pain, neck, shoulder and elbow pain. (R. at 466-67.) She stated that she participated in counseling, but it did not help her. (R. at 466.) Ring stated that she did not want to take antidepressant medication. (R. at 466.) Dr. Kaur diagnosed hypertension, hyperlipidemia and chronic pain syndrome. (R. at 467.)

On December 5, 2011, Ring was seen at University of Virginia Health System, ("UVA"), for an audiologic evaluation due to her long-standing history of dizziness with episodic vertigo. (R. at 307.) She reported feeling pressure in her

-7-

head, describing it as a "band around the head" feeling. (R. at 307.) The evaluation was within normal limits. (R. at 307.) On May 23, 2013, Dr. Mark Shaffrey, M.D., reported that Ring's spine was nontender to palpation; her cervical range of motion was full; her extremities were nontender and without clubbing, cyanosis or edema; she was alert and cooperative; her speech was fluent; her visual fields were full to confrontation; and her gait was steady. (R. at 430-31.) An MRI of Ring's brain showed no growth of the brain lesion. (R. at 430.) Dr. Shaffrey noted that Ring's symptoms were not bothersome enough for her to consider any treatment at that time. (R. at 430.) On June 10, 2013, Ring underwent a colonoscopy and endoscopy. (R. at 436-42.) The colonoscopy was normal with the exception of a rectal polyp, which was removed. (R. at 437.) The endoscopy showed a hiatus hernia. (R. at 438.)

On March 17, 2012, Dr. Kevin Blackwell, D.O., evaluated Ring at the request of Disability Determination Services. (R. at 312-16.) Ring was alert, cooperative and oriented with good mental status. (R. at 314.) Her affect, thought content and general fund of knowledge were intact. (R. at 314.) Dr. Blackwell reported that Ring's gait was symmetrical and balanced; her shoulder and iliac crest heights were good and equal bilaterally; she had tenderness along the left trapezius muscle and along the lumbar musculature on the left; she had bilateral knee tenderness; her upper and lower extremities were without effusion or obvious deformities and showed normal strength; fine motor movements and skill activities of the hands were normal; and reflexes in the upper and lower extremities were good and equal bilaterally. (R. at 315.) He reported that Ring had normal range of motion in her cervical and thoracic spines; shoulders; elbows; hips; knees; ankles;

and wrists. (R. at 312.) Dr. Blackwell diagnosed chronic pain; carpal tunnel syndrome; sleep apnea; and hypertension. (R. at 315.)

Dr. Blackwell opined that Ring had the ability to sit for six hours in an eight-hour workday and stand for two hours in an eight-hour workday, assuming normal positional changes. (R. at 316.) He found that Ring could perform above head reaching with both upper extremities one-third of the day and that she could perform foot pedal operation with both the right and left foot one-third of the day. (R. at 316.) Dr. Blackwell opined that Ring could not crouch, crawl or work around unprotected heights and that she should avoid repetitive and continuous stair climbing, as well as squatting and kneeling. (R. at 316.) He found that Ring could occasionally lift items weighing up to 30 pounds and frequently lift items weighing up to 20 pounds. (R. at 316.) No vision, communicative, hearing or environmental limitations were noted. (R. at 316.) Dr. Blackwell opined that Ring had no limitations of hand usage, including fine motor movements and skill activities. (R. at 316.)

On April 10, 2012, Dr. Andrew Bockner, M.D., a state agency physician, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Ring had no limitations on her ability to perform her activities of daily living and to maintain social functioning. (R. at 54.) Dr. Bockner found that Ring had mild difficulties in maintaining concentration, persistence or pace and that she had not experienced any episodes of decompensation of extended duration. (R. at 54.) Dr. Bockner noted that, although Ring had diagnoses of depression and anxiety, including panic attacks, the medical evidence of record did not establish that she

suffered more than mild limitations as a result. (R. at 54.)

On April 11, 2012, Dr. Thomas M. Phillips, M.D., a state agency physician, opined that Ring had the residual functional capacity to perform light work. (R. at 56-58.) He reported that Ring could frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; and never climb ladders, ropes or scaffolds. (R. at 56-57.) No manipulative, visual or communicative limitations were noted. (R. at 57.) Dr. Phillips opined that Ring should avoid even moderate exposure to hazards, such as machinery and heights. (R. at 57.)

On June 25, 2012, Ring was seen by James Kegley, M.S., at Frontier Health for anxiety, panic attacks and depression. (R. at 360-79.) Ring reported stress as a result of multiple domestic issues. (R. at 375.) Kegley diagnosed anxiety disorder, not otherwise specified, and depressive disorder. (R. at 373.) He assessed Ring's then-current Global Assessment of Functioning, ("GAF"),[7] score at 50,[8] with her highest and lowest GAF scores being 50 within the prior six months. (R. at 373.) On August 20, 2012, Ring's primary complaint was pain associated with her fibromyalgia and arthritis. (R. at 424.) Her mood was mildly depressed with congruent affect, and she interacted satisfactorily with the other group members. (R. at 424.)

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[8] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

-10-

On September 20, 2012, Ring reported that she was anxious about "a lot of things," adding that she recently learned that her daughter was pregnant again, which caused her more anxiety. (R. at 421.) Her mood and affect were appropriate, and she interacted satisfactorily with the other group members. (R. at 421.) On September 27, 2012, Ring reported that she was terrified at the thought of losing her 72-year-old mother. (R. at 419.) Her mood and affect were appropriate, and she interacted satisfactorily with the other group members. (R. at 419.) On October 11, 2012, Ring reported that she felt personal shame over how her family had turned out. (R. at 418.) Her mood and affect were appropriate, and she interacted satisfactorily with the other group members. (R. at 418.) On October 18, 2012, Ring participated in group therapy. (R. at 417.) Her mood and affect were appropriate, and she interacted satisfactorily with the other group members. (R. at 417.) Ring discussed the issues involving her children, stating that "they are spoiled, rotten brats." (R. at 417.)

On December 13, 2012, Ring reported that her children put a lot of stress on her and that she had other family "dramas" that she dealt with. (R. at 416.) Kegley reported that Ring's mood was mildly depressed with congruent affect. (R. at 416.) On January 2, 2013, Ring stated that, "I am constantly on the go" for everyone else's needs. (R. at 413.) She stated that she believed that she "ha[d] to do everything" for her children, because of their issues, such as lack of driver's licenses, lack of vehicles and unemployment. (R. at 413.) Kegley reported that Ring's mood was mildly depressed with congruent affect. (R. at 413.) On February 11, 2013, Ring reported having pain resulting from fibromyalgia. (R. at 411.) Kegley noted that Ring provided examples where it appeared that Ring attempted

-11-

to control her grown children. (R. at 411.) He reported that Ring's mood was mildly depressed with congruent affect. (R. at 411.) Kegley reported that Ring was aware of the benefit of moving towards more independence for her family, but was adamant in her belief that she knew how to conduct some of their affairs much better than them. (R. at 411.)

On May 3, 2013, Ring stated that she experienced "stress[] all the time" with her family and that she was "constantly running for everybody." (R. at 409.) Kegley reported that Ring's mood was mildly depressed with congruent affect. (R. at 409.) While Ring stated that she wanted to stop enabling her children and instead allow them to grow up to stand by themselves, she was firm in her belief that she knew best how to raise her grandchildren. (R. at 409.) On June 12, 2013, Ring reported having panic attacks. (R. at 464.) She reported that her children were the source of her stress and depression. (R. at 464.) Ring was mildly depressed with congruent affect. (R. at 464.) On September 30, 2013, Ring reported that she followed her grandson's important events and appointments to ensure that they got done. (R. at 463.) She stated that her primary care physician told her that she had not been diagnosed with fibromyalgia, and, if she would lose weight, her pain symptoms would lessen. (R. at 463.) Her mood was mildly depressed with congruent affect. (R. at 463.)

On October 16, 2013, Ring reported that she continued to take care of many tasks for her son and grandchildren. (R. at 469.) On November 19, 2013, Ring reported anxiety, depression and anger resulting from her family's dysfunctional actions. (R. at 477.) She reported that she continued to take care of things for her

-12-

son and grandchildren. (R. at 477.) On December 10, 2013, Ring complained of pain, problems with her children and depression related to thinking about what it would be like if her mother passed away. (R. at 476.) Her mood ranged from mildly to moderately depressed with congruent affect. (R. at 476.) On December 30, 2013, Ring reported that she had nightmares every night, which she stated contributed to her depression and anxiety. (R. at 493.) She reported that she continued to take care of her grandchildren. (R. at 493.) Kegley reported that Ring was mildly depressed with congruent affect. (R. at 493.)

On October 25, 2012, Jeanne Buyck, Ph.D., a state agency psychologist, completed a PRTF, indicating that Ring had no limitations on her ability to perform her activities of daily living and to maintain social functioning. (R. at 67-68.) Buyck found that Ring had mild difficulties in maintaining concentration, persistence or pace and that she had not experienced any episodes of decompensation of extended duration. (R. at 67.) Buyck noted that, although Ring had diagnoses of depression and anxiety, the medical evidence of record did not establish that she suffered more than mild limitations as a result. (R. at 67.)

On October 25, 2012, Dr. Joseph Duckwall, M.D., a state agency physician, opined that Ring had the residual functional capacity to perform light work. (R. at 69-71.) He reported that Ring could frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; and never climb ladders, ropes or scaffolds. (R. at 69-70.) No manipulative, visual or communicative limitations were noted. (R. at 70.) Dr. Duckwall opined that Ring should avoid even moderate exposure to hazards, such as machinery and heights. (R. at 70.)

-13-

On December 12, 2012, Ring saw Dr. Jody Bentley, D.O., for fatigue; depression; headaches; anxiety; and a "choking feeling." (R. at 402.) Dr. Bentley diagnosed dysphagia and anxiety. (R. at 402.) On March 13, 2013, Dr. Bentley reported that Ring had a normal gait, with no clubbing or cyanosis; she had normal movements of all extremities, with no joint instability; her muscle strength and tone were normal; she had intact cranial nerves; deep tendon reflexes were 2+ and symmetric; she was oriented, with depressed mood and flat affect; and her recent and remote memory was not impaired. (R. at 400.) Dr. Bentley diagnosed dysphagia, anxiety and hypertension. (R. at 400.) On April 17, 2013, Ring complained of neck, back and foot pain. (R. at 388-94.) She reported that she cleaned houses for a living, and, at times, her back was too painful to work. (R. at 388.) Dr. Bentley reported that Ring had a normal gait, with no clubbing or cyanosis; normal movements of all extremities; normal muscle strength and tone; no involuntary movements were noted; she had muscle spasms in the thoraco-lumbar spine and supraspinatus muscle spasms bilaterally; intact cranial nerves; deep tendon reflexes were 2+ and symmetric; she was oriented, with a normal affect and intact insight and judgment; and her cervical, thoracic and lumbar lordosis were within normal limits. (R. at 390.) Ring had tenderness, asymmetry and tissue change at the T5-T9 level, and she had severe tenderpoints at the T10-T12 region and lumbar region. (R. at 391.) Dr. Bentley diagnosed lower back pain; esophageal reflux; bilateral foot pain; neck pain; and hypertension. (R. at 392.)

On June 19, 2013, Ring complained of bilateral foot pain and back pain. (R. at 455-60.) Dr. Bentley had referred Ring to a podiatrist, but she did not keep the appointment. (R. at 455.) She had a normal affect, depressed mood and intact

-14-

insight and judgment. (R. at 457.) On July 31, 2013, Ring was seen for back and arm pain and dizziness. (R. at 450-54.) Ring also complained of a choking sensation and shortness of breath. (R. at 450.) She reported that her stress was exacerbated by problems with family members. (R. at 451.) Dr. Bentley reported that Ring's affect was normal, and her recent memory was not impaired. (R. at 452.) She had restricted range of motion at the T4-T9 levels and at the L4-L5 level. (R. at 453.) Ring was diagnosed with hiatal hernia; anxiety; lower back pain; pain in the left arm; vertigo; and esophageal reflux. (R. at 453.) On September 12, 2013, Dr. Bentley reported that Ring had a normal gait, with no clubbing or cyanosis; she had normal movements of all extremities, with no joint instability; her muscle strength and tone were normal; she had intact cranial nerves; deep tendon reflexes were 2+ and symmetric; she was oriented, with a normal affect; and her insight and judgment were intact. (R. at 446-47.) She was diagnosed with viral sinusitis. (R. at 447.) On December 5, 2013, Ring complained of vertigo and headaches. (R. at 479-83.) She reported that her hypertension was controlled. (R. at 479.) Dr. Bentley reported that Ring's insight and judgment were intact; she had a normal affect; her mood was slightly anxious/agitated; and she was emotionally labile. (R. at 481.)

On December 9, 2013, Robert S. Spangler, Ed.D., a licensed psychologist, evaluated Ring at the request of Ring's attorney. (R. at 485-88.) Ring had adequate recall of remote and recent events; she had fair eye contact; her motor activity was tense; her affect was restricted; and her mood was anxious and depressed. (R. at 486.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Ring obtained a full-scale IQ score of 75. (R. at 487.) Spangler

-15-

diagnosed mild to moderate persistent depressive disorder; moderate to severe unspecified anxiety disorder; cognitive disorder, not otherwise specified; moderate to severe varied concentration after 45 minutes; and slow pace. (R. at 488.)

On December 16, 2013, Spangler completed a mental assessment, indicating that Ring had a satisfactory ability to maintain attention and concentration for 45 minutes. (R. at 490-92.) He found that Ring had a seriously limited ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to function independently; to maintain attention and concentration after 45 minutes; to understand, remember and carry out simple job instructions; to maintain personal appearance; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 490-91.) Spangler opined that Ring had no useful ability to deal with work stresses; to understand, remember and carry out complex and detailed job instructions; and to demonstrate reliability. (R. at 490-91.) He opined that Ring would be absent from work more than four days a month. (R. at 492.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2015); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether

-16-

she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2015).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Ring argues that the ALJ erred by failing to give full consideration to Dr. Blackwell's and Spangler's assessments. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) Based on my review of the record, I find this argument unpersuasive. It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if he

-17-

sufficiently explains his rationale and if the record supports his findings.

The ALJ noted that he was giving Dr. Blackwell's opinion little weight because it was inconsistent with the medical evidence of record. (R. at 18.) Although Dr. Blackwell opined that Ring could sit for only six hours in an eight-hour workday and stand for two hours in an eight-hour workday, the medical evidence, including Dr. Blackwell's report, does not support his opinion. On examination, Dr. Blackwell found that Ring had mostly normal physical findings that included symmetrical and balanced gait; her shoulder and iliac crest heights were good and equal bilaterally; her upper and lower extremities were with no effusion or obvious deformities, and showed normal strength; fine motor movements and skill activities of the hands were normal; and reflexes in the upper and lower extremities were good and equal bilaterally. (R. at 315.) He reported that Ring had normal range of motion in her cervical and thoracic spines; shoulders; elbows; hips; knees; ankles; and wrists. (R. at 312.)

The record consistently shows that Ring had normal physical examination findings that included a normal gait; normal extremity movement; no joint swelling or instability; normal muscle strength and tone; normal reflexes; normal motor skills; and full range of motion the cervical and thoracic spines. (R. at 312, 315, 390, 400, 430, 446-47.) Although Ring complained of bilateral knee pain, Dr. Blackwell observed no objective abnormality. (R. at 315.) X-rays of Ring's left knee taken in February 2012, one month prior to Dr. Blackwell's examination, showed only minimal medial compartment narrowing. (R. at 342.) X-rays of Ring's thoracic spine showed mild S-shaped scoliosis and very nominal

-18-

osteophytes at the mid-levels. (R. at 342.)

The record shows that Ring complained of bilateral foot pain in November 2012, April 2013 and June 2013. (R. at 388-94, 455, 466-67.) While Dr. Bentley ordered foot x-rays and referred Ring to a podiatrist, Ring did not follow through with either order. (R. at 455.) In September 2013, Ring stated that she had fibromyalgia, but acknowledged that her primary care physician told her that she had not been diagnosed with it and that her pain symptoms would lessen if she lost weight. (R. at 463.) The record shows that Ring's treatment was conservative, such as taking ibuprofen for headaches and general joint aches, and diet, exercise and weight loss was recommended. (R. at 31, 448, 459-60, 483.) In fact, Ring testified that she did not take any prescribed pain medication. (R. at 31.) It is noted that Ring was diagnosed with meningioma in October 2011; however, follow-up evaluations were within normal limits. (R. at 294, 306-07, 430.) In May 2013, an MRI of Ring's brain showed no growth of the brain lesion, and Dr. Shaffrey reported that Ring's symptoms were not bothersome enough for her to consider any treatment at that time. (R. at 430.)

In addition, the ALJ noted that Dr. Blackwell's opinion was inconsistent with Ring's daily activities, which included living alone and personally caring for herself; taking care of her disabled husband and three adult children, who were dependent on her; doing household chores for herself and her adult son; preparing simple meals; watching television; driving; and visiting her grandchildren and driving them to and from school. (R. at 19, 39-41, 284, 409, 413, 463, 469, 476-77.) Consistent with this evidence, the state agency physicians provided no greater

restrictions than those found in the ALJ's residual functional capacity finding. (R. at 56-58, 69-71.)

The ALJ noted that he was giving Spangler's opinion little weight because it was inconsistent with the medical evidence of record; it contradicted many of Ring's statements to her therapist regarding all of the things that she did for her family; and because it was inconsistent with Spangler's own report. (R. at 19.) While Ring reported being primarily stressed and depressed due to multiple family issues, the record shows that Ring consistently had normal to mild mental status examination findings. (R. at 276, 281, 284, 289, 292, 314, 319, 322, 325, 334, 375, 400, 409, 411, 413, 416-19, 421, 424, 457, 463-64, 469, 476-77, 481.) During group sessions, Ring had an appropriate mood and affect and participated satisfactorily. (R. at 417-19, 421.) In addition, Ring acknowledged that she had no problem relating to family, friends, neighbors or others and that her grandchildren often stayed with her once a week and had no problem following instructions. (R. at 40, 201-02.) Ring stated that she was "constantly on the go" for everyone else's needs because she "ha[d] to do everything" for her children. (R. at 409, 413.) She reported following her grandson's important events and appointments to ensure that they got done. (R. at 463.) Based on this, I find that the ALJ properly weighed the medical evidence and that substantial evidence exists to support the ALJ's finding with regard to Ring's residual functional capacity.

Based on the above reasoning, I find that substantial evidence exists in the record to support the ALJ's finding that Ring was not disabled. An appropriate Order and Judgment will be entered.

-20-

ENTERED: November 18, 2016.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

Case 2:15-cv-00017-PMS   Document 15   Filed 11/18/16   Page 21 of 21   Pageid#: 581